UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

CHOOSECO LLC,                    )
                                 )
          Plaintiff,             )
                                 )    Case No. 2:19-cv-08
                                 )
NETFLIX, INC.,                   )
                                 )
            Defendant.           )

## OPINION AND ORDER

Plaintiff Chooseco, a Vermont-based publishing company, has brought multiple claims against Defendant Netflix for its alleged use of Chooseco's word mark CHOOSE YOUR OWN ADVENTURE in the dialogue of its film *Black Mirror: Bandersnatch*. Chooseco's Amended Complaint includes actions for trademark infringement, unfair competition, false designation of origin, dilution under the Lanham Act and unfair competition under Vermont common law. Now before the Court is Netflix's motion to dismiss Chooseco's complaint for failure to state a claim upon which relief can be granted. For the reasons set forth below, Defendant's motion to dismiss is **denied.**

## Factual Background

### I.   Chooseco's Books and Trademarks

Chooseco is the current publisher of CHOOSE YOUR OWN ADVENTURE books. ECF No. 14 at ¶ 11. The book series employs an interactive narrative structure that allows "the reader [to] act[] as the story's protagonist and make[] choices to determine

the narrative's plot and ending." *Id.* at ¶ 13.  Each choice the reader makes leads to a different page in the book, creating "multiple potential endings at various points." *Id.*

CHOOSE YOUR OWN ADVENTURE books "are one of the bestselling children's series of all time," with over 265 million copies sold, and were "widely read in the 1980s and 1990s." *Id.* at ¶ 14.  Their popularity remains, with more than 620,000 copies printed for distribution in the United States within the last year alone.  *Id.*  Currently, Chooseco's target demographic for these books "is primarily children and young adults between seven and fourteen years old." *Id.*  As one of its main marketing strategies, Chooseco attempts to tap into the nostalgia of "adults who read the books when they were young" to entice them into buying CHOOSE YOUR OWN ADVENUTRE books for their children. *Id.*

Chooseco owns a federally registered trademark for the word mark CHOOSE YOUR OWN ADVENTURE.  *Id.* at ¶ 1.  This mark covers various types of media including books and movies.  *Id.* at ¶ 16.  For example, Chooseco has licensed the mark for a board game and currently has an option contract with Twentieth Century Fox to develop an interactive film series based on the books.  *Id.* at ¶ 18.  In addition, Chooseco owns and operates a website that provides interactive games and has partnered with Audible to release interactive audiobooks.  *Id.* at ¶¶ 19-20.

2

Chooseco has also consistently used certain elements in its trade dress for CHOOSE YOUR OWN ADVENTURE books.  *Id.* at ¶ 12. Historically, the books featured an illustration surrounded by a double frame with two separate colors.  *Id.*  The books now in print display a frame with only one color but retain the same shape.  *Id.*  However, Chooseco has not registered its trade dress.

Beginning in 2016, Netflix attempted to purchase a license to use the word mark CHOOSE YOUR OWN ADVETURE in connection with various films and cartoons.  *Id.* at ¶ 21.  Netflix and Chooseco never reached an agreement regarding the license.  *Id.*  In fact, "[o]n at least one occasion before the release of *Bandersnatch*, Chooseco sent a written cease and desist request to Netflix asking Netflix to stop using the CHOOSE YOUR OWN ADVENTURE mark in its marketing efforts for a different program."  *Id.* at ¶ 22.

## II.  Netflix and *Black Mirror: Bandersnatch*

"Netflix is a popular media . . . company that primarily offers subscription-based digital video streaming services."  *Id.* at ¶ 23.  Its streaming library includes *Black Mirror* — "a speculative fiction anthology series that examines the relationship between humans and technology."  *Id.* at ¶ 25.  On December 28, 2018, Netflix released *Bandersnatch* as a part of this series.  *Id.* at ¶ 26.  Both *Black Mirror* as a whole and *Bandersnatch* itself contain "dark and violent themes" and are

intended for mature audiences.  *Id.* at ¶ 35.

    *Bandersnatch* is an interactive film that employs a branching narrative technique allowing its viewers to make choices that affect the "plot and ending of the film."  *Id.* at ¶ 26.  Viewers essentially control the protagonist, Stefan Butler.  ECF 18-1 at 4.  *Bandersnatch* chronicles Butler's attempts to develop a videogame based on a fictitious book, also titled "Bandersnatch." *Id.*

    The pivotal scene at issue in this litigation occurs near the beginning of the film.  ECF No. 14 at ¶ 33.  Butler's father remarks that Jerome F. Davies, the author of the fictitious book in the film, must not be a very good writer because Butler keeps "flicking backwards and forwards."  *Id.* at ¶ 31.  Butler responds: "No, it's a 'Choose Your Own Adventure' book. You decide what your character does."  *Id.* at ¶ 31-32.  Of note, the subtitles for the film couch the phrase in quotation marks and capitalize the first letter of each word.  *Id.* at ¶ 31.  Chooseco claims that Netflix "provides its own closed-captioning and subtitle services."  *Id.* at ¶ 33.  Netflix neither confirms nor denies this point in either its motion to dismiss or its reply memorandum. *See* ECF Nos. 18-1, 25.

    To promote *Bandersnatch*, Netflix employed a similar, although not exact, trade dress as that used by CHOOSE YOUR OWN ADVENTURE books in multiple marketing campaigns.  ECF No. 14 at ¶

42.  For example, Netflix created a website for Tuckersoft, the fictional videogame company where Butler developed his videogame. *Id.* at ¶ 43.  This website displays multiple fictional videogame covers that have a "double rounded border element."  *Id.* at ¶ 44. A few of these fictional video game covers also appear in the film itself.  *Id.* at ¶ 45.  In addition, Netflix used images of the videogame covers while promoting *Bandersnatch* in the United Kingdom.  *Id.* at ¶ 47.  It created "several 'pop up' storefronts that were designed to resemble a 1980's videogame store that appears in the film."  *Id.*  Netflix used images of the covers in these stores and on posters hung "on public streets around the same time that the pop up storefronts were viewable."  *Id.* Finally, Netflix used the cover for the *Bandersnatch* videogame as one of a few thumbnails for the film on its website.  *Id.* at ¶ 46.

## III. Chooseco's Claims and Netflix's Motion to Dismiss

Chooseco's Amended Complaint contains four claims for relief based on Netflix's alleged use of the word mark CHOOSE YOUR OWN ADVENTURE.  Its first cause of action is for federal trademark infringement under 15 U.S.C. § 1114.  Chooseco alleges that "Netflix has adopted and is using CHOOSE YOUR OWN ADVENTURE and an element of its trade dress in a manner that is likely to cause confusion, and is causing confusion . . . among the general purchasing public as to the origin and affiliation of Netflix

with Chooseco." ECF No. 14 at ¶ 58. Chooseco continues: "Netflix is likely to deceive the public into believing that the reference to a "Choose Your Own Adventure" book in the film *Black Mirror: Bandersnatch* originates from, is associated with, or is otherwise authorized by Chooseco." *Id.* at ¶ 59. Chooseco asserts that this confusion has damaged its "reputation, good will, and profits." *Id.*

Chooseco's second claim involves federal trademark dilution under 15 U.S.C. § 1125(c). Chooseco argues that its trademark is famous within the meaning of Section 43(c) of the Lanham Act and that Netflix's use of the mark harms the reputation and dilutes the distinctive quality of the mark. *Id.* at ¶¶ 66-67. The third claim is for unfair competition and false designation of origin under 15 U.S.C. § 1125(a). Here, Chooseco states that Netflix has unlawfully offered for sale a product containing Chooseco's trademark—creating an "express and implied representation that the product originates from, is associated with, or is otherwise authorized or endorsed by Chooseco." *Id.* at ¶¶ 74, 76. It argues that "Netflix has consciously and deliberately sought to capitalize on the distinctive quality and fame of Chooseco's trademark and [the] consumer confusion that it has created." *Id.* at ¶ 75. Chooseco's fourth claim is for unfair competition under Vermont common law. Chooseco contends that Netflix "intended to and did trade upon the goodwill associated with Chooseco's

trademark" by "misle[ading] the public into assuming a connection exists between Chooseco and Netflix."  *Id.* at ¶ 84.  It argues that "Netflix's actions amount to deception and misappropriation of the exclusive property owned by Chooseco" and "tarnish[] the desirable reputation and image associated with Chooseco and Chooseco's trademark."  *Id.* at ¶¶ 85-86.

### Standard of Review

When reviewing Rule 12(b)(6) motions to dismiss, courts must determine whether a complaint pleads "sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  To be facially plausible, a complaint must contain "well-pleaded facts" that "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* at 678, 679.  A complaint "does not need detailed factual allegations" but "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Twombly*, 550 U.S. at 555; *see Iqbal*, 556 U.S. at 678.

In determining the plausibility of a claim, courts assume that all the factual allegations in the complaint are true. *Iqbal*, 556 U.S. at 678.  Moreover, courts view the facts in the light most favorable to the plaintiff, drawing all inferences in its favor.  *Cohen v. S.A.C. Trading Corp.*, 711 F.3d 353, 359 (2d

Cir. 2013).  However, "pleadings that . . . are no more than
conclusions are not entitled to the assumption of truth."  *Iqbal*,
556 U.S. at 679.

## Discussion

### I.   First Amendment Protection From The Lanham Act

Netflix argues that the First Amendment insulates its use of
Chooseco's mark from Lanham Act claims because *Bandersnatch* is an
artistic work.  In *Rogers v. Grimaldi*, the Second Circuit crafted
a two-part balancing test that addresses unauthorized uses of
trademarks in artistically expressive works.  875 F.2d 994, 999
(2d Cir. 1989).  The *Rogers* test weighs the public interest in
avoiding consumer confusion against the public interest in free
artistic expression. *Id.*  Generally, the scales will not tip in
favor of applying the Lanham Act to an expressive work unless: 1)
the disputed use has no artistic relevance to the underlying
work, or 2) if it has some artistic relevance, the use explicitly
misleads as to the source or the content of the work.  *Id.*

### A.   *Bandersnatch* is an artistic work

As a preliminary matter, Chooseco argues that *Bandersnatch*
is not a purely artistic work.  ECF No. 24 at 19. Chooseco
asserts that "[d]iscovery is needed to determine whether
*Bandersnatch* is, at least in part, a marketing tool designed to
collect behavioral information on its viewers." *Id.*  It claims
that "Netflix collects data on its viewers' choices within

*Bandersnatch*, which it may sell in the future or use in its own marketing of other content to its subscribers or potential subscribers."  *Id.*; ECF No. 14 at ¶¶ 49-51.  It further alleges that "Netflix may have sold product placement opportunities as a form of advertisement, which would also suggest the film is not purely artistic."  ECF No. 24 at 19.  Ultimately, Chooseco suggests that the Court should "put a slight thumb on the trademark owner's side of the scale when the work at issue is artistic in part and commercial in part."  *Id.* at 20.

Courts addressing this issue have found that the First Amendment equally protects works with mixed purposes as those that are "purely artistic."  For example, as the Supreme Court held in *Joseph Burstyn, Inc. v. Wilson*: "That books, newspapers, and magazines are published and sold for profit does not prevent them from being a form of expression whose liberty is safeguarded by the First Amendment.  We fail to see why operation for profit should have any different effect in the case of motion pictures." 343 U.S. 495, 501-02 (1952).  The Court recognized that films are "a significant medium for the communication of ideas" and their importance "as an organ of public opinion is not lessened by the fact" that "their production, distribution, and exhibition is a large-scale business conducted for private profit."  *Id.*  Most importantly, the Second Circuit developed the *Rogers* test with mixed-motive artistic works in mind.  875 F.2d at 997-98

9

("Titles, like the artistic works they identify, are of a hybrid nature, combining artistic expression and commercial promotion.").

Chooseco has failed to show that Netflix's means of deriving profit from its artistic works should change this analysis and reduce the First Amendment protections afforded to *Bandersnatch*. Nor has Chooseco shown that an artistic work with some commercial purposes increases the likelihood of consumer confusion.  Thus, the *Rogers* test applies to this case and no tinkering with the ledger is needed.

**B.   Netflix's Use Has Artistic Relevance**

Under *Rogers*, "[t]he threshold for 'artistic relevance' is purposely low and will be satisfied unless the use 'has no artistic relevance to the underlying work whatsoever.'"  *Louis Vuitton Malletier S.A. v. Warner Bros. Entm't Inc.*, 868 F. Supp. 2d 172, 178 (S.D.N.Y. 2012) (quoting *Rogers*, 875 F.2d at 999) (emphasis in original); *see also E.S.S. Entm't 2000, Inc. v. Rock Star Videos, Inc.*, 547 F.3d 1095, 1100 (9th Cir. 2008) ("the level of relevance merely must be above zero").  "[I]t is not the role of the Court to determine how meaningful the relationship between a trademark and the content of a literary work must be; consistent with *Rogers*, any connection whatsoever is enough for the Court to determine that the mark's use meets 'the appropriately low threshold of minimal artistic relevance.'"

10

*Dillinger, LLC v. Elec. Arts Inc.*, No. 1:09-cv-1236-JMS-DKL, 2011 WL 2457678, at *6 (S.D. Ind. June 6, 2011) (quoting *Rogers*, 875 F.2d at 999).  Given this low bar, Netflix's use of Chooseco's mark satisfies the artistic relevance prong of the *Rogers* test.

The protagonist of *Bandersnatch* uses CHOOSE YOUR OWN ADVENTURE to describe the fictitious book he intends to convert into a videogame.  Both the videogame and the book in the film have interactive narrative structures that allow the reader or player to make choices that alter the storyline.  Likewise, *Bandersnatch* employs a branching narrative technique that allows the viewer to make choices throughout the film that directly affect its plot.  The use of CHOOSE YOUR OWN ADVENTURE has artistic relevance because it connects the narrative techniques used by the book, the videogame, and the film itself.  In addition, taking a broader view of the film reveals that the main premise of *Bandersnatch* and *Black Mirror* is to comment on the continually-mounting influence technology has on society.  To this end, *Bandersnatch* seemingly intends for the viewer's control over the protagonist to parallel the ways technology controls modern day life.  This expands the use's artistic relevance because it anchors the fractalized interactive narrative structure that comprises the film's overarching theme.

Netflix's use of the mark could also have artistic relevance because the mental imagery associated with the book series

11

promotes the retro, 1980s aesthetic *Bandersnatch* seeks to elicit. As Chooseco states, the books were popular and widely read in the era the film is set.  Netflix's use of the mark adds to the setting by referencing a real book series that was popular at the time.  Courts have found similar arguments persuasive in other trademark cases applying the *Rogers* test.  *See, e.g., E.S.S. Entm't*, 547 F.3d at 1097 (stating that using the name of a Los Angeles strip club had at least some artistic relevance to a videogame whose goal was to "mimic the look and feel of actual Los Angeles neighborhoods"); *Roxbury Entm't v. Penthouse Media Group, Inc.*, 669 F. Supp. 2d 1170, 1176 (C.D. Cal. 2009) ("Defendants have . . . demonstrate[ed] at least some relationship between the mental imagery associated with the term 'Route 66,' *e.g.*, road trips, cross-country travel, and the content of Defendants' [pornographic] movie."); *Dillinger*, 2011 WL 2457678, at *5 (holding that the use of the "Dillinger" trademark in "The Godfather Games" had "more than zero relevance" to the videogames because of the gangster era mental imagery associated with the Dillinger name).

Chooseco claims that the "mark's only role in context can be exploiting the publicity value of associating the film with Chooseco's iconic brand."  ECF No. 24 at 17.  It reiterates Netflix's argument that the use "is artistically relevant to the film because its plot involves the protagonist's efforts to

convert the book 'Bandersnatch' into a videogame, and the
storytelling structure of the film mirrors the fictional
storytelling structure of the book and videogame." *Id.* at 17-18.
Chooseco argues that "[t]his explanation confirms why the
protagonist refers to the fictional book in that scene, but does
not explain why Chooseco's unique brand has any artistic
relevance to that scene or the film as a whole." *Id.*  In support
of this contention, Chooseco lists numerous alternative phrases
that Netflix could have used "to convey the concept of an
interactive story without referencing the mark itself." *Id.* at
18-19.  Chooseco concludes that, given these alternatives,
Netflix's use of its mark adds nothing other than "marketing
power." *Id.* at 19.

The Second Circuit specifically addressed, and dismissed,
the "alternative avenues" analysis in *Rogers*. 875 F.2d at 999;
*see also Parks v. LaFace Records*, 329 F.3d 437, 450-52 (6th Cir.
2003) (finding that the Second Circuit rejected the alternative
avenues test in *Rogers*).  Emphasizing the detrimental impact of
restricting the use of words, the court stated "[w]e cannot
indulge the facile assumption that one can forbid particular
words without running a substantial risk of suppressing ideas in
the process." *Rogers*, 875 F.2d at 999 (quoting *Chen v.
California*, 403 U.S. 15, 26 (1971)).  The court found that the
"'no alternative avenues' test does not sufficiently accommodate

13

the public's interest in free expression." *Rogers*, 875 F.2d at 999.  Thus, the existence of alternative phrases does not provide evidence as to whether the use of Chooseco's mark has artistic relevance to *Bandersnatch*.

In addition, Chooseco analogizes this case to *Parks v. LaFace Records* as support for its contention that Netflix's use of its mark holds no artistic relevance.  ECF No. 24 at 11, 19. *Parks* involved a song by the rap group OutKast titled "Rosa Parks."  329 F.3d at 441.  In this song, OutKast made repeated references to the phrase "move to the back of the bus" and claimed that the use of Rosa Parks' name was metaphorical or symbolic of that phrase.  *Id.* at 452.  Rosa Parks sued OutKast for false advertising under the Lanham Act.  *Id.*  The district court applied the *Rogers* test and granted summary judgment to OutKast.  *Id.* at 442.  The Sixth Circuit reversed the district court's decision, finding "that the relationship between the title and the content of the song [was] certainly not obvious and, indeed, [was] open to reasonable debate."  *Id.* at 452 (internal quotation marks omitted).

*Parks* seemingly supports Chooseco's claims.  However, the tone of the decision suggests that the Sixth Circuit may have focused more on its aversion to including a civil rights icon in a rap song with vulgar language than on the purposely low threshold of the *Rogers* test's artistic relevance prong.  *See id.*

14

at 454 ("[C]rying 'artist' does not confer *carte blanche*
authority to appropriate a celebrity's name" and "crying 'symbol'
does not change that proposition."); *id.* at 453 ("While
Defendants' lyrics contain profanity and a great deal of
'explicit' language, . . .  they contain absolutely nothing that
could conceivably, by any stretch of the imagination, be
considered, explicitly or implicitly, a reference to courage, to
sacrifice, to the civil rights movement or to any other quality
with which Rosa Parks is identified."); *id.* ("In lyrics that are
laced with profanity and in a 'hook' or chorus that is pure
egomania, many reasonable people could find that this is a song
that is clearly antithetical to the qualities identified with
Rosa Parks.") (emphasis in original).  This observation erodes
some of *Parks*' persuasiveness as applied to the case at bar.

In addition, cases with more similar facts support finding
that Netflix's use of Chooseco's mark satisfies this prong of
*Rogers*.  For example, in *Louis Vuitton*, the Southern District of
New York dismissed a Lanham Act claim involving *The Hangover:
Part II*.  868 F. Supp. 2d at 174.  In the scene at issue, Alan,
one of the characters, is seen carrying a Diophy bag that "looks
confusingly similar" to a Louis Vuitton bag.  *Id.* at 178.  Alan
hands this bag to another character and says "[be] [c]areful
[its] a Lewis Vuitton."  *Id.*  The court found that Alan's "remark
to Teddy . . . comes across as snobbish only because the public

15

signifies Louis Vuitton . . . with luxury and a high society lifestyle." *Id.* The court continued: "His remark also comes across as funny because he mispronounces the French 'Louis' like the English 'Lewis,' and ironic because he cannot correctly pronounce the brand name of one of his expensive possessions, adding to the image of Alan as a socially inept and comically misinformed character." *Id.* The court held that these explanations, coupled with the fact there was no indication the use was commercially motivated, satisfied *Rogers*' artistic relevance prong. *Id.* at 178-79.

Likely the most factually-analogous case similarly supports a finding of artistic relevance. *In Fortres Grand Corp. v. Warner Bros. Entm't Inc.*, 947 F. Supp. 2d 922 (N.D. Ind. 2013), the court dismissed an action under the Lanham against *The Dark Knight Rises*. *Id.* at 924. *Fortres* involved the use of the plaintiff's trademark "Clean Slate" in both the movie *The Dark Knight Rises* and on fantasy websites created to promote the film. *Id.* The court spent little time on the artistic relevance prong, stating "[p]art of the plot of *The Dark Knight Rises* involves Batman's promise to another character . . . to procure a software program called CLEAN SLATE that will erase a person's criminal history from every computer database in the world." *Id.* at 932. (internal quotations removed). The court found that "there can be little doubt" this use satisfied the first prong of *Rogers*.

*Id.*

Here, the protagonist of *Bandersnatch* attempts to convert the fictional book "Bandersnatch" into a videogame, placing the book at the center of the film's plot.  Netflix used Chooseco's mark to describe the interactive narrative structure shared by the book, the videogame, and the film itself.  Moreover, Netflix intended this narrative structure to comment on the mounting influence technology has in modern day life.  In addition, the mental imagery associated with Chooseco's mark adds to *Bandersnatch*'s 1980s aesthetic.  Thus, Netflix's use of Chooseco's mark clears the purposely-low threshold of *Rogers*' artistic relevance prong.

### C.   Discovery To Determine Explicitly Misleading

Because the Court has found that there is some artistic relevance in Netflix's use of Chooseco's mark, the First Amendment will protect the use unless it explicitly misleads as to the source of the work.  *Rogers*, 875 F.2d at 999.  Under the second prong of *Rogers*, the relevant question is whether the use "'induces members of the public to believe [the work] was prepared or otherwise authorized' by the plaintiff."  *Louis Vuitton*, 868 F. Supp. 2d at 179 (quoting *Twin Peaks Prods., Inc v. Publ'ns Int'l Ltd.*, 996 F.2d 1366, 1379 (2d Cir. 1993)).  "This approach takes into account the ultimate test in trademark law, namely, the likelihood of confusion."  *Cliffs Notes, Inc. v.*

*Bantam Doubleplay Dell Publ'g. Group, Inc.*, 886 F.2d 490, 495 (2d Cir. 1989).

"[T]he finding of likelihood of confusion must be particularly compelling to outweigh the First Amendment interests recognized in *Rogers*." *Twin Peaks Prods.*, 996 F.2d at 1379. "[T]he deception or confusion must be relatively obvious and express, not subtle or implied." 6 J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 31:144.50 (5th ed. Supp. 2019). This requirement makes the explicitly misleading prong "a more exacting version of the likelihood-of-confusion test." *Gordon v. Drape Creative, Inc.*, 909 F.3d 257, 265, n.7 (9th Cir. 2018); *see also Fortres*, 947 F. Supp. 2d at 932 ("[T]he fact that it has to be explicitly misleading makes this a high bar.") (emphasis in original). "Not surprisingly, in most cases in which a disputed mark was used in the content rather than the title of an expressive work . . . the results favored the alleged infringer, on the basis that the use was not explicitly misleading." Michael A. Rosenhouse, Annotation, *Protection of Artistic Expression from Lanham Act Claims Under Rogers v. Grimaldi, 875 F.2d 994 (2d Cir. 1989)*, 22 A.L.R. Fed. 3d Art. 4 (2017).

As an initial matter, the parties dispute whether it is appropriate for courts to grant a motion to dismiss based on a *Rogers* defense. Chooseco claims that "consideration of a *Rogers*

18

defense on a motion to dismiss is generally disfavored." ECF No. 24 at 10 (citing *Sapieyevski v. Live Nation Worldwide, Inc.*, No. 18-830 (TJK), 2019 WL 1284302, at *4 (D.D.C. Mar. 20, 2019) ("[C]onsideration of the *Rogers* defense on a motion to dismiss appears to be the exception, not the rule.")). On the other hand, Netflix argues that "[c]ourts . . . routinely apply *Rogers* and its progeny to grant motions to dismiss Lanham Act claims." ECF No. 18-1 at 18 (collecting cases). The court in *Louis Vuitton* directly addressed this issue, finding that "[a]lthough many courts have considered the *Rogers* test on a summary judgment motion, not a motion to dismiss, the circuit has never stated that a court cannot properly apply the *Rogers* test . . . on a motion to dismiss." 868 F. Supp. at 183. The court continued: "In the context of a motion to dismiss, courts have disposed of trademark claims where simply looking at the work itself, and the context in which it appears, demonstrates how implausible it is that a viewer will be confused into believing that the plaintiff endorsed the defendant's work." *Id.* (collecting cases).

Here, Chooseco has sufficiently alleged that consumers associate its mark with interactive books and that the mark covers other forms of interactive media, including films. The protagonist in *Bandersnatch* explicitly stated that the fictitious book at the center of the film's plot was "a Choose Your Own Adventure" book. In addition, the book, the videogame, and the

19

film itself all employ the same type of interactivity as
Chooseco's products.  The similarity between Chooseco's products,
Netflix's film, and the fictious book Netflix described as a
"Choose Your Own Adventure" book increases the likelihood of
consumer confusion.  *See Gordon v. Drape Creative, Inc.*, 909 F.3d
257, 268 (9th Cir. 2018) ("[T]he potential for explicitly
misleading usage is especially strong when the senior user and
the junior user both use the mark in similar artistic
expressions.").

In addition, *Bandersnatch* was set in an era when Chooseco's
books were popular—potentially amplifying the association between
the film and Chooseco in the minds of consumers.  Moreover, the
complaint alleges that Netflix appropriated aspects of Chooseco's
trade dress "both in the film and its promotion and marketing of
*Bandersnatch*."  ECF 14 No. at ¶ 41.  While the link between
Chooseco and the aspects of its trade dress that Netflix
purportedly usurped is not particularly strong, this
consideration adds to a context which may create confusion.
Ultimately, the parties' arguments regarding the explicitly
misleading prong present a factual dispute, the disposition of
which is premature without the benefit of discovery.

## II.  Descriptive Fair Use

Netflix raises a descriptive fair use defense in addition to
its claims to First Amendment protections.  Descriptive fair use

is an affirmative defense that requires a defendant show "that the use was made (1) other than as a mark, (2) in a descriptive sense, and (3) in good faith." *Kelly-Brown v. Winfrey*, 717 F.3d 295, 308 (2d Cir. 2013).  To grant a motion to dismiss based on descriptive fair use, the Court must find that "the facts necessary to establish the defense are evident on the face of the complaint." *Id.*  However, the Second Circuit has warned generally "fair use . . . requires consideration of facts outside of the complaint and thus is inappropriate to resolve on a motion to dismiss." *Id.*; *see also* 2 J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 11:49 (5th ed. Supp. 2019) ("Because classic fair use is an affirmative defense, it is normally not appropriate for consideration on a . . . motion to dismiss for failure to state a claim.").  In this case, the Court lacks sufficient facts at this stage of the litigation to dismiss Chooseco's claims.

### A.   Use Other Than As a Mark

To "determin[e] whether a particular use is made 'as a mark,' [courts] ask whether the defendant is using the 'term as a symbol to attract public attention.'" *Kelly-Brown*, 717 F.3d at 306 (quoting *JA Apparel Corp. v. Abboud*, 568 F.3d 390, 400 (2d Cir. 2009)).  Courts consider the physical nature and context of a use to make this determination.  *JA Apparel*, 568 F.3d at 401; *see also* RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 28 cmt. c

(1995) (recognizing the relevance of the "physical nature of the use in terms of size, location, and other characteristics in comparison with the appearance of other descriptive matter or other trademarks."). Here, the character in *Bandersnatch* held up a book and stated, "it's a 'Choose Your Own Adventure Book.'" ECF No. 14 at ¶ 31. Importantly, the subtitles cabined the phrase in quotation marks and capitalized the first letter of each word. The physical characteristics and context of the use demonstrate that it is at least plausible Netflix used the term to attract public attention by associating the film with Chooseco's book series.

### B. Descriptive Sense

In addition, the Court cannot yet determine whether Netflix used Chooseco's mark in a descriptive sense. Generally, when courts find that the defendant's use is descriptive, the phrase at issue is in common usage. *Kelly-Brown*, 717 F.3d at 311. However, "there is no requirement that a usage be immediately recognizable as a popular phrase for it to be descriptive" so long as it describes a characteristic of the defendant's product. *Id.* at 311-12. That said, courts distinguish between descriptive and suggestive uses. A descriptive use imparts information about a defendant's product directly, while a suggestive use "requires some operation of the imagination to connect [the mark] with the goods." *Union Carbide Corp. v. Ever-Ready Inc.*, 531 F.2d 366,

379 (7th Cir. 1976).   "[A]s a defendant's use of a term becomes less and less purely descriptive, its chances of prevailing on the fair use defense become less and less likely." *Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Management, Inc.*, 618 F.3d 1025, 1042 (9th Cir. 2010).   Ultimately, the test for determining the descriptiveness of a use turns on consumer perception. *Sands, Taylor & Wood Co. v. Quaker Oats Co.*, 978 F.2d 947, 953-54 (7th Cir. 1992) ("[T]he true test [of descriptiveness] is one of *consumer perception*—how is [the term] perceived by the average prospective consumer?") (emphasis and alterations in the original); *see also Kelly-Brown*, 717 F.3d at 312 (acknowledging the importance of consumer perception in determining the descriptiveness of a use).

Here, Netflix argues that it used the phrase "'Choose Your Own Adventure' . . . to describe the branching storytelling technique used in the fictitious book."   ECF No. 18-1 at 22 (emphasis removed).   Netflix has not argued that choose your own adventure is a common phrase, nor can it.   To do so would call for consideration of facts outside of the complaint.   *See Kelly-Brown*, 717 F.3d at 311.   Additionally, choose your own adventure arguably is not purely descriptive of narrative techniques—it requires at least some imagination to link the phrase to interactive plotlines.   Moreover, any descriptive aspects of the phrase may stem from Chooseco's mark itself.   In

other words, the phrase may only have descriptive qualities because Chooseco attached it to its popular interactive book series.  The Court lacks the facts necessary to determine whether consumers perceive the phrase in a descriptive sense or whether they simply associate it with Chooseco's brand.  Thus, it is inappropriate to grant Netflix's motion to dismiss based on a fair use defense.

### C.  Good faith

The final element of a fair use defense requires that Netflix show it used Chooseco's mark in good faith.  The Second Circuit "equate[s] a lack of good faith with the subsequent user's intent to trade on the good will of the trademark holder by creating confusion as to the source or sponsorship."  *EMI Catalogue P'ship v. Hill, Holiday, Connor, Cosmopulos Inc.*, 228 F.3d 56, 66 (2d Cir. 2000).  "Even where there is no direct evidence of intent, 'if there is additional evidence that supports the inference that the defendant sought to confuse consumers as to the source of the product, . . . the inference of bad faith may fairly be drawn.'"  *Kelly-Brown*, 717 F.3d at 312 (quoting *EMI Catalogue P'ship*, 228 F.3d at 66).  Such evidence includes the defendant's prior knowledge of the senior user's mark, the availability of alternative terms to describe the pertinent characteristic, and the placement of the defendant's own mark.  *Id.*; *EMI Catalogue P'ship*, 228 F.3d at 65.

Chooseco's complaint pleads factual allegations that preclude granting Netflix's motion to dismiss.  The complaint shows that Netflix had prior knowledge of Chooseco's mark. Netflix attempted to purchase a license to use the mark in another context and used the mark to market for a different program until Chooseco sent a cease and desist letter.  While not dispositive, Netflix's prior knowledge supports drawing a reasonable inference that Netflix intended to trade on the good will of Chooseco's brand.  *See Kelly-Brown*, 717 F.3d at 313 ("[A] plaintiff may also show absence of good faith where a junior user had knowledge or constructive knowledge of the senior user's mark and chose to adopt a similar mark.").

The complaint also alleges that Netflix intentionally copied aspects of Chooseco's trade dress in order to create further confusion regarding the source or sponsorship of the film.  The complaint claims that Netflix benefited from the confusion and association with Chooseco's brand, proffering discussions in the press and on social media as evidence.  ECF No. 14 at ¶¶ 37-38. Additionally, Netflix could have used numerous other phrases to describe the fictitious book's interactive narrative technique. *See Sierra On-Line, Inc. v. Phoenix Software, Inc.*, 739 F.2d 1415, 1423 (9th Cir. 1984) ("[Defendant's] choice of the phrase 'Hi-Res Adventure' when other phrases were available could indicate an intent to trade on [plaintiff's] good will and

product identity."). These factual allegations present at least a plausible claim that Netflix used Chooseco's mark in bad faith.

In sum, the Court has not found that "the facts necessary to establish the defense are evident on the face of the complaint." *Kelly-Brown*, 717 F.3d at 308. Rather, Chooseco has pleaded sufficient factual allegations indicating that it is at least plausible Netflix used CHOOSE YOUR OWN ADEVENTURE as a mark, in a non-descriptive sense, and in bad faith. Thus, in keeping with the general consensus regarding the descriptive fair use defense, the Court finds it inappropriate to resolve the issue at this stage of the litigation.

## III. Addition Arguments Regarding Dilution Claim

Netflix argues that the Court should dismiss Chooseco's dilution claims for two additional reasons. First, Netflix alleges that "[a] claim for dilution by tarnishment requires that a plaintiff's mark be used as a mark or trade name for *defendant's* products, and that any reputational harm to plaintiff's mark flow specifically from defendant's use of the mark to refer to its *own* goods." ECF No. 18-1 at 31 (emphasis in original). Netflix asserts that "*Bandersnatch* does not use the phrase 'Choose Your Own Adventure' as a source-designator for the film or the Netflix service." *Id.* Thus, in Netflix's view, the challenged use cannot give rise to a claim for trademark dilution.

26

This argument is unpersuasive.  Federal law defines dilution by tarnishment as an "association arising from the similarity between a mark or trade name and a famous mark that harms the reputation of the famous mark."  15 U.S.C. § 1125(c)(2)(C).  "A trademark may be tarnished when it is linked to products of shoddy quality, or is portrayed in an unwholesome or unsavory context, with the result that the public will associate the lack of quality or lack of prestige in the defendant's goods with the plaintiff's unrelated goods."  *Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 588 F.3d 97, 110 (2d Cir. 2009) (quoting *Hormel Foods Corp. v. Jim Henson Productions, Inc.*, 73 F.3d 497, 507 (2d Cir. 1996)).  Dilution does not inherently require that this association result in consumer confusion.  *Moseley v. V Secret Catalogue, Inc.*, 537 U.S. 418, 427 (2003).

Chooseco has offered sufficient factual allegations in its complaint to present a plausible dilution claim.  It alleged that Netflix used its mark to label the fictitious book at the center of *Bandersnatch*'s plot.  Chooseco further alleges that the association between Chooseco's mark and *Bandersnatch* dilutes the goodwill and marketing value of the mark because of *Bandersnatch*'s dark and disturbing content.

Netflix tries to refute a finding that these allegations satisfy the pleading requirements of a dilution claim.  It points out that "[t]he Second Circuit does not recognize an action for

27

dilution where the defendant uses the plaintiff's mark not to denote the defendant's good or services, but rather to identify goods or services as those of the plaintiff."  ECF No. 18-1 at 31 (quoting *Allied Interstate LLC v. Kimmel A Silverman P.C.*, No. 12 Civ. 4204 (LTS)(SN), 2013 WL 4245987, at *4 (S.D.N.Y. Aug. 12, 2013)).  However, that is not what Netflix did in this case. Instead of using Chooseco's mark to identify Chooseco's products, it used Chooseco's mark in reference to a fictitious book in its film.  That said, Chooseco's complaint contains allegations that, when taken as true, demonstrate that Netflix's use of Chooseco's mark implicates the core purposes of the anti-dilution provision. *See Hormel Foods Corp.*, 73 F.3d at 507 ("The *sine qua non* of tarnishment is a finding that plaintiff's mark will suffer negative associations through defendant's use."); *see also New York Stock Exchange, Inc. v. New York, New York Hotel, LLC*, 69 F. Supp. 2d 479, 491 (S.D.N.Y. 1999), *aff'd in part, rev'd in part* 293 F.3d 550 (2d Cir. 2002) ("The essence of tarnishment therefore is . . . the displacement of positive with negative associations of the mark that . . . reduces the value of the mark to the trademark owner.").  Thus, the Court cannot properly dismiss Chooseco's dilution claims on this ground.

Netflix next contends that "the Lanham Act expressly exempts dilution claims based on a 'noncommercial use of a mark' of the type at issue here."  ECF No. 18-1 at 31.  This "exemption

incorporates the concept of commercial speech from the commercial speech doctrine." *Mattel*, 296 F.3d at 906 (internal quotations and citation omitted). "The 'core notion' of commercial speech is that 'which does no more than propose a commercial transaction.'" *IMS Health Inc. v. Sorrell*, 630 F.3d 263, 274 (2d Cir. 2010) (quoting *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 66 (1983)). "Outside this so-called 'core' lie various forms of speech that combine commercial and noncommercial elements." *Bad Frog Brewery, Inc. v. New York State Liquor Auth.*, 134 F.3d 87, 97 (2d Cir. 1998). Whether hybrid situations should be "treated as commercial speech depends on factors such as whether the communication is an advertisement, whether the communication makes reference to a specific product, and whether the speaker has an economic motivation for the communication." *Id.*

As noted above, *Bandersnatch* itself clearly falls within the ambit of protected speech. However, Netflix's use of Chooseco's mark may qualify as commercial speech. Chooseco's complaint alleges that "Netflix's motivations in including its mark in the film were purely economic." ECF No. 24 at 29. In addition, the use references Chooseco's most popular product-its interactive book series. *Id.* The complaint also alleges that Netflix used elements of Chooseco's trade dress in its promotion and marketing of the film. *Id.* Chooseco claims that it may uncover more uses of its mark or elements of its trade dress in Netflix's

29

promotions if the Court allows for discovery.  These allegations
satisfy Chooseco's pleading requirements.

## IV.  Unfair Competition Claim

Netflix contends that Chooseco's common law cause of action
for unfair competition should be dismissed for the same reasons
as Chooseco's Lanham Act claims.  Netflix also argues that
Chooseco failed to plausibly plead a likelihood of consumer
confusion.  Because the Court finds that Chooseco has met its
pleading requirements regarding these issues, Chooseco is
entitled to proceed with its unfair competition claim as well as
its Lanham Act causes of action.

### Conclusion

For the foregoing reasons, Netflix's motion to dismiss (ECF
No. 18) is **denied.**  Chooseco's motion for leave to file a
surreply (ECF No. 26) is **granted.**

DATED at Burlington, in the District of Vermont, this 11th
day of February, 2020.

/s/ William K. Sessions III
William K. Sessions III
District Court Judge
